**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PRINCIPAL LIFE INSURANCE CO., an
Iowa corporation; PETULA
ASSOCIATES LTD., an Iowa
corporation; EQUITY FC LTD., an
Iowa corporation,
                     *Plaintiffs-Appellants,*

v.

CONSTANCE A. ROBINSON; CHESTER
L. ROBINSON, individually and as
trustee of the CHESTER ROBINSON
TRUST; LYNN ROBINSON; KAY BELL;
THEA WOOD; DEE HANSON,
                     *Defendants-Appellees.*

No. 03-35376

D.C. No.
CV-00-01345-BR

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
November 3, 2004—Portland, Oregon

Filed January 6, 2005

Before: Stephen S. Trott, Andrew J. Kleinfeld,
Circuit Judges, and Louis H. Pollak,* Senior Judge.

Opinion by Judge Trott

---

*Hon. Louis H. Pollak, Senior U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

165

## COUNSEL

G. Frank Hammond, Cable Huston Benedict Haagensen & Lloyd LLP, Portland, Oregon, for the plaintiffs-appellants.

Lainie Block, Larkins Vacura LLP, Portland, Oregon, for the defendants-appellees.

## OPINION

TROTT, Circuit Judge:

Principal Life Insurance Company, Equity FC Ltd., and Petula Associates Ltd., a subsidiary of Principal, (collectively "Principal") appeal the district court's dismissal of Principal's

action for declaratory relief relating to a material dispute over a rent recalculation provision in a ground lease. The district court concluded that the case was not ripe for adjudication and thus that it lacked subject-matter jurisdiction. Because the district court arrived at this conclusion by mistakenly applying a ripeness standard derived from cases involving administrative agencies, we reverse the district court's jurisdictional determination.

This case presents an actual controversy, between parties having adverse legal interests, and with sufficient immediacy ordinarily to warrant the issuance of a declaratory judgment. Nevertheless, the district court had discretion to accept jurisdiction or not depending on an application of the *Brillhart* factors. *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942). Because the district court did not articulate reasons for its provisional declination to exercise jurisdiction pursuant to *Brillhart* and its progeny, we remand to allow the district court to address the relevant factors and then to exercise its discretion. Consequently, we vacate also the award of fees and costs.

## BACKGROUND

The Chester Robinson Trust, Kay Bell, Thea Wood, Dee Hanson, and Constance, Chester, and Lynn Robinson (collectively, "the Robinsons") own property in Washington County, Oregon. In 1978, they entered into a ninety-nine-year ground lease agreement with MTR Company, which assigned its interest in the ground lease to Koll Interreal a year later. During lease renegotiations between Koll Interreal and the Robinsons in 1985, it became apparent to both parties that they disagreed as to the interpretation of Section 2.1 of the ground lease, which is a pivotal rent recalculation provision.

Section 2.1 of the ground lease provides for rent adjustment in the thirty-first year (2008) and sixty-first year of the lease term. The Robinsons contended that two critical variables affecting the amount of rent will change when the rent is

recalculated in the thirty-first and sixty-first years: (1) the base property value of the land and (2) the ratio for recalculating the rental amount. Koll Interreal, on the other hand, claimed that only the ratio variable would change. This dispute affects not only the amount of rent, but also the commercial value of the lease.

Unable to resolve the dispute in 1985, Koll Interreal and the Robinsons agreed to preserve their respective positions and resolve it in the future. The dispute was memorialized in a lease amendment. With full knowledge of the existence of this dispute, a subsidiary of Principal purchased a portion of Koll Interreal's interest in the ground lease in 1986.

Principal attempted to sell its entire interest in the ground lease for the first and only time in 1998, creating a portfolio of properties that included it. Two investors, Transwestern and PS Business Parks, made offers on the leasehold interest. Principal pursued the Transwestern offer because it was significantly higher and offered a "smoother closing." During those sale negotiations, Transwestern sought a reduction in price because of the unresolved lease dispute with the Robinsons and attempted also to resolve the dispute with the Robinsons. These attempts at resolving the contract dispute proved fruitless, and Transwestern withdrew its offer. Principal has made no other attempts to sell the interest.

Without a definitive way to calculate the value of the lease, Principal found itself unable to make a reasonable business decision as to what to do with it, i.e., sell it, develop the property, or purchase the property. Accordingly, Principal sought a declaratory judgment, asking the district court to resolve the controversy and to declare that Principal's interpretation of section 2.1 is correct.

The district court determined that a "substantial controversy" exists between the parties, but it determined nevertheless that it lacked subject-matter jurisdiction because Principal had

failed to prove that it would suffer "a direct and immediate hardship that is more than possible financial loss." Moreover, the district court noted that it would decline to exercise jurisdiction even if it had it because "[d]iscretionary access to judicial resources should be reserved for those controversies that parties do not invite."

Principal moved the district court to reconsider, arguing that this "hardship" standard derived from cases involving administrative agencies and was inappropriate in an insular private party contract action. The district court maintained its original position regarding ripeness, and again asserted that even if the case were ripe, the court would decline to exercise jurisdiction, citing its earlier statement regarding "controversies that parties do not invite."

## DISCUSSION

[1] The Declaratory Judgment Act states, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Consequently, we have long held that the district court must first inquire whether there is an actual case or controversy within its jurisdiction. *American States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). Second, if the court finds that an actual case or controversy exists, the court must decide whether to exercise its jurisdiction by analyzing the factors set out in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942), and its progeny. *Kearns*, 15 F.3d at 143-44.

## A.   Standard of Review

We review de novo the first prong of the *Kearns* inquiry, i.e., the question of ripeness and subject-matter jurisdiction. *Laub v. United States Dep't of the Interior*, 342 F.3d 1080, 1084 (9th Cir. 2003); *Kearns*, 15 F.3d at 143. Beyond the threshold jurisdictional question, we review discretionary

decisions about the propriety of hearing declaratory judgment actions for abuse of discretion. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289-90 (1995). However, if the district court does not provide reasoning under the discretionary prong of the inquiry, we must remand the case to allow the district court to properly exercise its discretion. *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc) ("If on appeal the record is devoid of reasoning . . . the case must be remanded to the district court to record its reasoning in a manner sufficient to permit the 'proper application of the abuse of discretion standard on appellate review.' " (citation omitted)).

## B.   Appropriate Standard for Determining Ripeness

**[2]** The requirement that a case or controversy exist under the Declaratory Judgment Act is "identical to Article III's constitutional case or controversy requirement." *Kearns*, 15 F.3d at 143. If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction. *Id.* Consequently, the first question we must answer is what standard should be applied to determine whether this private contract dispute is ripe.

**[3]** The district court applied a standard unique to cases involving administrative agencies and, as a result, found that it lacked subject-matter jurisdiction. In the context of administrative actions, the prudential aspect of the ripeness doctrine is well-settled: whether administrative action is ripe requires the court to evaluate (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). We further announced in *Western Oil & Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1291 (9th Cir. 1990), *reh'g denied*, that the hardship element of the *Abbott Labs* standard is not met unless a litigant shows that "withholding review would result in 'direct and immedi-

ate' hardship and would entail more than possible financial loss."

The *Abbott Labs* and *Western Oil* standards find their roots in cases involving administrative agencies and recognize that judicial action should be restrained when other political branches have acted or will act. *See, e.g.*, *United States v. Braren*, 338 F.3d 971, 975 (2003) (listing administrative cases applying the *Abbott Labs* standard); *Village of Gambell v. Babbit*, 999 F.2d 403 (9th Cir. 1993) (applying the *Western Oil* financial loss standard to a case involving an administrative agency); WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 3532.1 (2d ed. 1984 & Supp. 2004) ("The values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government lie at the core of ripeness policies.").

Recognizing this controlling principle of allocation of authority, we have embraced the rationale behind the *Abbott Labs* standard in the administrative context:

> The ripeness doctrine "is intended 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements *over administrative policies*, and also to *protect the agencies* from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir. 1986) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967)).

> To ascertain whether an *administrative action is ripe* "requires an evaluation of the 'fitness of the issues for judicial decision and the hardship to the

parties of withholding court consideration.' " *Id.* (quoting *Abbott Laboratories*, 387 U.S. at 149).

*California Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987) (emphasis added).

It is true that Principal does not point to, and we have not found, a case limiting the application of the *Abbott Labs* and *Western Oil* standards to the administrative context. But it is equally true that the Robinsons do not point to, and we have not found, a case applying the standard outside this context. We must decide therefore whether to extend the standard to cases in which a private party to a contract seeks a declaratory judgment on a contract.

**[4]** There is no legal or logical requirement compelling the extension of *Abbott Labs* and *Western Oil* to cases involving only private contracts. Importantly, a single administrative action has consequences for many members of the general public, not just those directly in the immediate controversy. For that reason, it is prudent for courts to limit their review of such actions to those involving the possibility of concrete injury greater than speculative or remote financial contingencies. But that logic does not extend to a private party contract action. The contingency of wide-ranging and remote adverse consequences does not exist in a private contract case — there either is or is not a financial consequence in the private party context. This case perfectly demonstrates that distinction: the only possible harm to Principal, both now *and in 2008*, is possible financial uncertainty and loss. To escape this predicament, Principal's only potential remedy is to bring an action for declaratory relief. Indeed, this is precisely the type of case for which declaratory relief is appropriate.

Moreover, the concerns over judicial entanglement in administrative agency actions before the agencies have had an opportunity to take action or make decisions do not exist in private party contract cases. No other action or decision is

forthcoming. And, allocation of authority concerns that present themselves in administrative actions are entirely absent. Furthermore, the fundamental role of the courts is to resolve concrete and present disputes between parties.

**[5]** For these reasons, application of the *Abbott Labs* and *Western Oil* standards is inappropriate in a case such as this. Accordingly, we conclude that the appropriate standard for determining ripeness of private party contract disputes is the traditional ripeness standard, namely, whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

## C.  Ripeness

**[6]** The contract dispute between Principal and the Robinsons over the critical rent recalculation provision is not an abstract or hypothetical disagreement. This is a typical contract dispute under which the parties' interests are clearly adverse, and a decision will affect the value of the lease. The district court so found, and the Robinsons do not seriously dispute this conclusion. Section 2.1 in the ground lease contract exists; the parties have always disagreed as to what it means; the dispute involves measurable financial consequences; and the parties have always known that the dispute would eventually need resolution. Regrettably, the parties have not resolved the dispute on their own and have now asked the courts to resolve it for them. The only question, therefore, is whether, at this point, the controversy has become sufficiently immediate, such that the district court has Article III jurisdiction to decide it. We conclude that it has.

**[7]** Owing to this dispute, Principal has had some difficulty selling its interest. Transwestern's failed attempt as a possible buyer at resolving the dispute in the lease, and its attempt to seek a price reduction, suggest that Principal will continue to

have difficulty selling the interest. Additional attempts to sell are likely to waste time and resources. From Principal's point of view, the correct way to price the interest for sale accurately is on the assumption that rent would be calculated in accordance with its interpretation of the rent recalculation provision. From a potential buyer's point of view, however, a less favorable possibility is a reality should the Robinsons' interpretation prevail. Under these conditions, the value of the lease is unascertainable, and the price is therefore unpredictable.

**[8]** This was precisely what happened in the Transwestern deal, illustrating that there is sufficient immediacy to warrant resolution. Were we to conclude otherwise, the property value of all long-term leases would be significantly diminished because disputes over these leases could not be promptly resolved by the courts. Moreover, because Principal is unable accurately to estimate the value of the interest, a decision whether to sell the interest or keep and develop it is impracticable. Without knowing how rent will be recalculated, Principal is unable to estimate which path will be the most profitable. These difficulties create a dispute that is sufficiently immediate to warrant the issuance of a declaratory judgment.

**[9]** The district court's inclination to find this suit unripe is understandable, given that Principal knew it was buying this uncertainty when it bought its interest in the ground lease. But this circumstance does not support the conclusion that the case fails to present a justiciable controversy and consequently that the court lacks subject-matter jurisdiction. Nothing in the 1985 lease amendment suggests that the parties did not intend to resolve this dispute until 2008, and nothing suggests that waiting until then would change anything. The parties did not "invite" this problem any more than does any party finding itself in an unavoidable dispute over the meaning of a contract. Courts exist to resolve such disputes. Thus, we conclude that the case is ripe.

### D.  Exercise of Discretion

**[10]** Despite a conclusion that the case is ripe, the Declaratory Judgment Act requires further analysis in connection with the district court's discretion, in line with *Brillhart*, as to whether or not to exercise jurisdiction. *Kearns*, 15 F.3d at 143. If the district court should decline to exercise its jurisdiction, it must "explain the basis for its decision on the record." *Dizol*, 133 F.3d at 1221. The district court's discretion to hear declaratory actions over which it has jurisdiction is guided by the Supreme Court's announcements in *Brillhart*.

**[11]** The *Brillhart* factors are non-exclusive and state that, "[1)] [t]he district court should avoid needless determination of state law issues; [2)] it should discourage litigants from filing declaratory actions as a means of forum shopping; and [3)] it should avoid duplicative litigation." *Dizol* 133 F.3d at 1225 (citing *Robsac*, 947 F.2d at 1371-73). "Essentially, the district court 'must balance concerns of judicial administration, comity, and fairness to the litigants.' " *Kearns*, 15 F.3d at 144 (quoting *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1367 (9th Cir. 1991)). We have noted additional and potentially relevant considerations such as:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

*Dizol*, 133 F.3d at 1225, n.5 (quoting *Kearns*, 15 F.3d at 145 (J. Garth, concurring)).

**[12]** The Robinsons argue that we should look to the district court's statements and questions in the oral record and conclude that the court demonstrated adequate reasoning under *Brillhart* for us to affirm. We need not determine whether any oral findings may supplement the court's written statements, however, because we conclude that the district court made no oral findings explaining the basis for a decision to exercise its jurisdiction. We note that the extent to which the district court declined, in its written opinion, to exercise its jurisdiction was dicta because the court had concluded that it lacked subject-matter jurisdiction.

There is no doubt that the district court was aware of its duty to apply the *Brillhart* considerations and make findings in deciding whether to exercise its discretion to hear the case. During oral argument, the court recited the factors *Brillhart* commands the district court to consider. The judge stated:

> With regard to the Court's discretion, I am supposed to balance, among other things, the concerns of judicial administration. . . . it seems to me that the balancing that I am supposed to employ relative to judicial administration weighs in favor of taking jurisdiction.
>
> I'm supposed to balance so-called "comity" issues . . . I don't know what that means in the context of this case, so I invite you to enlighten me.
>
> I am supposed to balance the fairness to the litigants in the exercise of discretion. . . . And I would like collaboration [sic] on that point. I don't understand what the unfairness is. . . . I really want to know what it is about the process that is — the Court ought to conclude is unfair in the exercise of discretion.
>
> Well, those are my questions.

Counsel for the Robinsons then pointed out, citing *Dizol,* that the judge was to make "findings on the record as to why you think it's appropriate to exercise your discretion in this case," to which the court responded, "I'm clearly keyed into that and . . . I'm trying to lay out what I think the various tests and factors are — I think are in issue."

With that background, the parties presented arguments as to these and other *Brillhart* and *Dizol* considerations, and the court repeatedly asked pointed questions on the issues. Nevertheless, the court's inquiries made in an attempt to sort out the issues are not tantamount to findings or reasoning. The only possible finding arises from the court's statement during oral argument that "judicial administration weighs *in favor of taking jurisdiction.*" (emphasis added).

Moreover, the district court's written opinion provides no guidance as to its evaluation of *Brillhart*. At footnote five of its written jurisdiction opinion, the court stated:

> Although the Court *does not reach the second part of the Kearns inquiry*, the Court notes nonetheless, it would exercise its discretion and decline to adjudicate this controversy at this time because Plaintiffs voluntarily acquired their leasehold interests with full knowledge of the outstanding dispute. Discretionary access to judicial resources should be reserved for those controversies that the parties do not invite.

(emphasis added). On reconsideration, the court noted that whatever standard the court applied to determine ripeness under the first prong of the inquiry, "the end result would be the same." The court pointed to footnote five of the original opinion and order, but again failed to provide any analysis as to the factors. The only inference of reasoning we can make is that the district court found questionable notions of fairness to weigh dispositively against accepting jurisdiction because

Principal "bought the problem." The court's problematic statement that "judicial resources should be reserved for controversies that parties do not invite," without any analysis of other factors, provides us with no guidance as to the court's weighing under *Brillhart*.

Finally, we note that, despite any possible concerns about fairness, a proper application of the *Brillhart* factors suggests that an exercise of discretion to hear the case would be appropriate. A reasoned analysis, however, belongs, in the first instance, to the district court.

### E.   Attorneys' Fees and Costs

The ground lease provides for attorneys' fees to be awarded to the prevailing party in litigation. Given our conclusion that the case is ripe, this litigation is ongoing. Consequently, at this point there is no prevailing party under Oregon law, and the award of attorneys' fees must be vacated. *Flying Tiger Line, Inc. v. Portland Trading Co.*, 290 Or. 605, 609 (1981). The award of costs under Federal Rule of Civil Procedure 54(b) is likewise vacated.

## CONCLUSION

**[13]** For the foregoing reasons, we reverse the district court's conclusion that it lacked subject-matter jurisdiction, remand for a proper application of the *Brillhart* factors, and vacate the award of costs and fees.

**REVERSED AND REMANDED.**